IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **BRIAN COOKE,** *et al.*, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| **v.** | * | **Civil Case No. SAG-22-297** |
| | * | |
| **MATTHEW LANCELOTTA,** *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

On February 4, 2022, Plaintiffs Brian Cooke and Scott Pevenstein filed suit in their individual capacities, and derivatively on behalf of themselves and several forfeited corporations (collectively, the "GC Entities") and Grilled Cheese & Co., LLC ("GCC")  against Defendants Matthew Lancelotta ("Matthew"), Kelley Lancelotta ("Kelley"), James Lancelotta ("James"), Richard Kuczak, Kuczak & Associates, PA, Crabby One Franchise, LLC ("Crabby One"), and several corporations listed as nominal Defendants.[1]  ECF 1.  The Complaint alleges 18 claims related to the Defendants' alleged fraud, embezzlement, and abusive tax scheme.

Along with the Complaint, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction (the "Motion").  ECF 2.  Plaintiffs' Motion asks this Court to impose an injunction that: (1) enjoins Matthew and James from acting as members, officers, directors, and agents of GCC and the GC Entities; (2) enjoins them from transferring any LLC assets, or assets acquired with LLC property, currently in their possession or control; (3) enjoins them from

---

[1] Confusingly, the Complaint names certain corporate entities as both plaintiffs and nominal defendants.  In other words, according to the Complaint, those entities are suing themselves.  This Court need not sort out that particular confusion to resolve the instant motion, however.

transferring any real or personal property with an individual or aggregate value of $5,000 or more without prior 21 day written notice to the Court and the Plaintiffs; and (4) appoints Cooke and Pevenstein as co-managers of GCC and trustees for the GC Entities.  ECF 2-1 at 45; ECF 2-2.

Matthew, James, and Kelley have opposed the Motion, ECF 13, 14, and Plaintiffs filed a reply.  ECF 15.  This Court has reviewed these filings and the exhibits attached to them.  This Court also held a hearing on March 1, 2022 at which the Court heard oral argument on the Motion by attorneys for the Plaintiffs, Matthew, and Kelley and James respectively.  For the following reasons, Plaintiffs' Motion will be denied because they have not made a showing sufficient to demonstrate that they will suffer imminent and irreparable harm without the imposition of the injunctive relief they seek.  However, this Court will order the parties to engage in limited expedited discovery, and will permit supplemental briefing, in preparation for an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction that will be set for April 7, 2022.

## I.    FACTUAL BACKGROUND

GCC is a grilled cheese restaurant in Baltimore that was founded by Victor Corbi, Matthew, James, and Pevenstein.  ECF 1 ¶ 74-75.  Those parties are signatories to the original operating agreement ("GCCOA").  ECF 2-1 at 8.  In 2012, GC Franchise was incorporated with a $500,000 investment from Cooke.  ECF 1 ¶ 127.  Corbi and Matthew were co-managers in GC Franchise's operating agreement ("GCFOA").  In a simultaneous transaction, Corbi and Matthew sold a portion of their interests for $150,000 such that Cooke would own 15% of GCC, 15% of GC Federal Hill (a wholly owned subsidiary of GCC), 15% of GC Sykesville, and 15% of future GC entities.  *Id.* ¶ 124.  Cooke was also added as a new member to GCC's operating agreement. ECF 2-1 at 8.  Corbi withdrew from GCC and the GC Entities in 2015.  ECF 1 ¶ 11.  There is a significant dispute about what happened to Corbi's shares, and Plaintiffs claim that Matthew

fraudulently converted them to himself by forcing Corbi to sell them to him far below market value. *Id.* ¶ 292. Plaintiffs claim that, in reality, Cooke is the rightful owner of Corbi's shares of GCC and the GC Entities. *Id.* ¶ 301. Plaintiffs also claim that, at some point, Matthew purchased James's interests as well through a series of "guaranteed payments." *Id.* ¶¶ 295-99. Although the Complaint alleges only that Cooke and Pevenstein "have the requisite percent voting interests to expel Matthew" from GCC and several of the GC Entities, *see id.* ¶ 518, Pevenstein submitted an affidavit saying that he and Cooke have, in fact, elected to remove Matthew as a member, ECF 1-2.

In December, 2020, Corbi contacted Cooke with concerns that Matthew and James had embezzled money and submitted false information to the IRS. ECF 1 ¶ 211. Corbi also stated that "[t]hat business has made an enormous amount of money over the years[,]" and raised concerns that Matthew's accountant, Mr. Kuczak, was "shady" and that "the books are cooked." ECF 1 ¶ 211.

In response, in February and July, 2021, respectively, Cooke and Pevenstein demanded that Matthew allow them to inspect the corporate records of GCC and the GC Entities. ECF 2-1 at 9. In response, Matthew requested a forbearance agreement where Cooke would agree not to file suit and would attempt mediation in exchange for Matthew's production of bank records and partnership returns. *Id.* Cooke agreed, and Matthew turned over some records and returns in March, 2021. *Id.* Cooke also retained a certified fraud examiner to help him trace his $500,000 investment. ECF 1 ¶ 214. The fraud examiner's investigation revealed widespread alleged falsification of tax returns, an alleged abusive tax scheme involving fictitious loans by Cooke and Pevenstein, and widespread embezzlement of corporate funds for personal uses. *See generally id.*

¶¶ 215-67.  These findings make up the bulk of the allegations supporting Plaintiffs' substantive claims.

Specifically, Plaintiffs claim that Matthew and James are engaging in an ongoing abusive tax scheme by falsifying partnership returns in order to disguise millions of dollars in distributions, constructive dividends, and compensation.  *Id.*  In 2015, Matthew allegedly reported that all distributions made to Matthew and James from GCC and the GC Entities were loans and, thus, not taxable.  *Id.*  Matthew allegedly falsely reported to the IRS that the source of those loans was not corporate earnings but, instead, fictional loans that Cooke and Pevenstein allegedly made to GCC and the GC Entities.  *Id.*  However, at least $500,000 of the "loans" Matthew and James took out allegedly came from funds directly traceable to Cooke's $500,000 investment.  *Id.*

From 2015-2020, Matthew and James allegedly claimed on partnership returns that the borrowed funds came from personal loans made by Cooke and Pevenstein, not from corporate earnings.  *Id.*  However, according to Plaintiffs, neither Cooke nor Pevenstein made any loans to any of the entities.  *Id.*

Plaintiffs also argue that Matthew and James never intended to pay back the monies they took from the entities.  ECF 2-1 at 11.  According to the Plaintiffs, "Matthew and James systematically erased the liabilities owed to Cooke and . . . the liabilities that Matthew and James owed to the entities for their purported 2015-2017 loans."  *Id.*  In 2018, Plaintiffs claim Matthew falsely alleged in partnership returns that Cooke had been paid back with funds that Pevenstein loaned to the entities.  However, Cooke was never paid back, and Matthew continued to report Pevenstein's fictitious 2018 loan on Pevenstein's K-1.  *Id.*

Moreover, Plaintiffs' fraud examiner identified over $2.5 million in unsupported business expenses for Matthew and Kelley's personal benefit.  ECF 1 ¶ 268-86.  Those expenses include

credit card payments, mortgage payments, luxury vehicles, country club memberships, thousands in ATM withdrawals at casinos, unreported intrabank transfers, funeral expenses, home furnishing expenses, Peloton memberships, and more. *Id.*

Finally, Plaintiffs allege that Matthew has made fraudulent conveyances by funneling money through Crabby One Franchising, a sham corporation, in order to "siphon away hundreds of thousands of dollars" belonging to GCC, GC Waugh Chapel, and GC Columbia to an undisclosed bank account. *Id.* at 100-04[2]; ECF 2-1 at 16-17. First, Plaintiffs' fraud examiner allegedly discovered hundreds of thousands of dollars of unexplained transfers from multiple entities into a "cash concentration account." ECF 2-1 at 17. Plaintiffs argue that Matthew incorporated Crabby One "for the sole purpose of obtaining a new federal identification number" in order to open the cash concentration account. *Id.* Second, Matthew allegedly applied for and received approximately $500,000 in PPP and EIDL loan money without telling Cook or Pevenstein. *Id.* Third, Matthew (who is also a real estate agent) allegedly purchased a house in his name on January 27, 2021 for $535,000 on the same day it was listed. *Id.* at 17-18. The same day, Matthew allegedly executed a deed for $545,700 in favor of two private lenders. *Id.* On March 25, 2021, Matthew listed the property for $925,000, and then relisted it for $995,000 one week later. *Id.* Matthew sold the property on April 26, 2021, and, at closing revealed that the $545,700 deed had been paid off. *Id.* Matthew allegedly received $990,000 in certified funds and/or cash from the transaction. *Id.* Matthew's purchase of the property was allegedly three days

---

[2] At this point in the Complaint—which is a 169-page document that jumps between time periods, causes of action, claims for relief, and strays far from the "short and plain statement of the claim[s]" that the Federal Rules of Civil Procedure require—the paragraph numbers go from paragraph 404 to 465 to 466, before picking back up again at 405. Fed. R. Civ. P. 8(a)(2). Accordingly, this portion of the opinion cites to page numbers in the Complaint, rather than using the non-sequential paragraph numbers.

after he provided incomplete bank records to the Plaintiffs in exchange for their agreement to delay filing suit against him.  *Id.* at 19.  On April 14, 2021, Matthew allegedly represented to the Plaintiffs that any monetary settlement was not "possible or proper[,]" but he then sold the property and netted $990,000 less than two weeks later.  *Id.*

## II.    LEGAL STANDARDS

A TRO or a preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest.  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, No. 9:19-cv-01369, 2019 WL 4942102, at *1 (D.S.C. Oct. 8, 2019).  The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

A TRO, much like a preliminary injunction, affords "'an extraordinary and drastic remedy' prior to trial."  *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, Civ. No. SAG-18-2315, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted).  Preliminary injunctive relief can take two forms: prohibitory injunctions and mandatory injunctions.  *League of Women Voters of N.C.*, 769 F.3d at 236.  Prohibitory injunctions aim to preserve the status quo, which the Fourth Circuit has defined as "the last uncontested status between the parties which preceded the controversy."  *Id.* (quoting *Pashby*, 709 F.3d at 319).  By

contrast, mandatory injunctions "alter rather than preserve the status quo[.]" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Mandatory preliminary injunctions are, therefore, "disfavored." *Id.* Accordingly, the Supreme Court and the Fourth Circuit have imposed a heightened standard for mandatory preliminary injunctive relief such that it is only available when "the applicants' right to relief [is] indisputably clear." *Id.* (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235 (1972)).

### III.    ANALYSIS

For purposes of this memorandum opinion only, this Court assumes without deciding that Plaintiffs have met their burdens to show that the balance of equities tips in their favor and that injunctive relief would be in the public interest. This Court is left, then, to evaluate whether Plaintiffs have shown a likelihood of success on the merits and whether, absent the injunction they seek, they will suffer irreparable harm.

#### a. Likelihood of Success on the Merits

This Court will assume, like the other two elements assumed above, that Plaintiffs can show a likelihood of success on the merits. However, because Plaintiffs' proposed injunction would remove Matthew from control over GCC and the GC Entities, ECF 2-2, it would upset "the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C.*, 769 F.3d at 236. Accordingly, this Court will briefly address the "likelihood of success on the merits" prong to explain why Plaintiffs have not met the heightened burden of showing that their "right to relief [is] indisputably clear" sufficient to justify the imposition of a mandatory injunction that alters the status quo. *Mountain Valley Pipeline, LLC*, 915 F.3d at 216 n.8.

An injunction effectively removing Matthew from control over GCC and the GC Entities would disrupt the "last uncontested status between the parties" because Matthew clearly *contests* the validity of Plaintiffs' attempt to exercise their alleged rights under the GCCOA to expel him from control over the companies.  At the March 1st hearing, Matthew's counsel explained that Matthew contests both the Plaintiffs' asserted percentages of ownership of the companies and the validity of their purported vote to expel him.  Indeed, the Plaintiffs have filed this lawsuit to vindicate their position on these issues *because* Matthew contests them.  Accordingly, at this point, the "last *uncontested* status between the parties" had Matthew in control of the companies. Plaintiffs' proposed injunction removing him from such control would, therefore, alter the status quo and require the imposition of a mandatory injunction.

As explained above, to justify the imposition of a mandatory injunction, Plaintiffs must do more than show they are merely "likely to succeed" but must, instead, show that their right to relief is "indisputably clear."  At this point, it is far from "indisputably clear" that Plaintiffs are correct in their assertion that Matthew is openly defying their valid vote to expel him from control. Plaintiffs rely on Section 7.2 of the GCCOA, which states:

> A member may be expelled from the Company by an affirmative vote of the Members holding a majority of the Ownership Interests held by Members other than the expelled Member if the expelled Member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the Company, or the expelled Member has willfully or persistently committed a material breach of the articles of organization of the Company or this agreement or has otherwise breached a duty owed to the Company or to the other Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with the expelled Member.  The right to expel a Member under the provisions of this section does not limit or adversely affect any right or power of the Company or the other Members to recover any damages from the expelled Member or to pursue other remedies permitted under applicable law or in equity. In addition to any other remedies, the Company or the other Members may offset any such damages against any amounts otherwise distributable or payable to the expelled Member.

ECF 1-20.  Plaintiffs also rely on a provision of the GCFOA that allows a Supermajority of the Members to remove another member for cause.  ECF 1-21.  As these provisions make clear, there are factual predicates that must be satisfied before members can vote to expel another member. This Court is in no position to make any factual findings on these predicates solely on the parties' written submissions and oral arguments.  While Plaintiffs may ultimately prove themselves right, they have not come close to showing that it is "indisputably clear" they are entitled to remove Matthew from control over GCC and the GC Entities.

**b.  Imminent and Irreparable Harm**

Although Plaintiffs' counsel refused repeated invitations from this Court at the TRO hearing to propose some sort of preliminary injunctive relief that *would not* alter the status quo, this Court will assume Plaintiffs' Motion encompasses a request for some lesser form of injunctive relief that would further their goal of preserving the assets of GCC and the GC Entities.  And while certainly not Plaintiffs' preferred form of relief, there are of course less disruptive alternatives that could be imposed.  As just one example, this Court could require Matthew to disclose every transaction in excess of a certain dollar amount.  Thus, this Court assumes for the purpose of considering this kind of prospective injunctive relief that Plaintiffs have met their burden to show they are likely to succeed on the merits.  However, to obtain preliminary injunctive relief of any sort, they still would need to demonstrate imminent, irreparable harm that will accrue absent an injunction.

Irreparable harm is "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  Irreparable harm must be harm that "cannot be adequately satisfied with a monetary award, or accurately calculated, or

that involves other rare and exceptional circumstances that justify the extraordinary relief of an injunction." *Barnett v. Young*, No. 5:18-cv-00279, 2018 WL 3405415, at *2 (S.D.W. Va. June 21, 2018) (citing *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)).

Here, Plaintiffs argue that they will suffer several forms of purportedly irreparable harm. First, Plaintiffs fear that "Matthew will transfer the remaining assets" of GCC, GC Waugh Chapel, and GC Columbia "beyond the reach of the Plaintiffs." ECF 2-1 at 39. Second, they argue that "[i]f Matthew is not removed as a member, the Plaintiffs fear that [he] will use the time before trial to destroy or falsify corporate records to prevent the IRS and the Plaintiffs from disputing the validity of the information returns [he] submitted from 2012 to 2020 or prove the total amount of cash stolen from the business." *Id.* Third, they argue that if Matthew is not removed as a member of the GCC and GC Entities they will not be able to trace the PPP and EIDL loans or "preserve the remaining assets of the LLCs." *Id.* at 40. Finally, Plaintiffs argue that Matthew has implicated them "in an abusive tax scheme and now that the IRS has been served a copy of this Complaint, Matthew should not have the ability to recreate the financial history of GCC and the GC Entities to support his fraudulent scheme, nor should Matthew have access [to] LLC funds." *Id.* at 42.

The Plaintiffs have not, at this point, met their burden to show that any of these feared harms is either imminent or irreparable. In general, Plaintiffs are clearly trying to protect the remaining assets in GCC and the GC Entities in order to try to recoup their investments and preserve their ability to obtain monetary relief for the wrongdoing they allege in the Complaint. And Plaintiffs appear to have some potentially strong allegations that Matthew has engaged in financial wrongdoing to date (indeed, Matthew's counsel agreed at the hearing that at least some of Plaintiffs' factual allegations have merit). But past harm or wrongdoing is not necessarily a

sufficient indication that future harm is imminent.  Matthew is now a defendant in a federal lawsuit that alleges he engaged in an egregious (and, if true, likely criminal) scheme to embezzle money and defraud investors and the United States government.  As a defendant in such a lawsuit, he now faces newfound obligations and potential consequences, like the requirement not to spoliate evidence and the threat of sanctions and contempt if he does.  He also now has lawyers who have similar legal and ethical obligations as officers of this Court.  Clearly the Plaintiffs believe Matthew will ignore these obligations, but especially when it comes to monetary harm, merely pointing to past financial wrongdoing does not assure this Court that further wrongdoing is imminent, in light of the present circumstances.

Moreover, through counsel, Matthew has pledged to turn over *all* financial information related to GCC and the GC Entities by March 3, 2022 and to supplement that production monthly thereafter.  That commitment gives this Court substantial confidence that the Plaintiffs do not, right now, face imminent harm, and that if any further harm occurs, Plaintiffs will know about it promptly and can renew their request for preliminary injunctive relief.

Finally, even if further monetary harm were demonstrably imminent, Plaintiffs have not met their burden to show such harm would be irreparable. "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  While "irreparable harm may still exist where . . . 'damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected[,]'" Plaintiffs have not come close to showing that, absent the injunction they seek, monetary relief will be unobtainable.  *Hughes*, 17 F.3d at 694 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

Plaintiffs argue that GCC and the GC Entities are insolvent, while simultaneously acknowledging that GCC has revenues in excess of $1 million and that its business is growing. Even had they shown corporate insolvency, they have sued individual defendants against whom they can pursue monetary relief.  They have not even attempted to show these individuals are similarly insolvent or otherwise "judgment-proof."  In fact, they have done the opposite.  Plaintiffs' own allegations suggest that company money has been used to purchase houses and cars, that Matthew has laundered money by flipping houses for hundreds of thousands of dollars in profits, and that Matthew has a seemingly successful business as a real estate agent.  ECF 1 at 7-8.  These are all assets Plaintiffs will be able to pursue if they prevail on their claims.  In the absence of any concrete showing that Plaintiffs will not be able to obtain a satisfactory monetary judgment against some combination of the corporate and individual Defendants, this Court is left only with Plaintiffs' allegations that suggest the Defendants may *not* be insolvent.  Accordingly, the Plaintiffs have fallen short of their burden to show that they are entitled to a temporary restraining order.

*     *     *

While the Plaintiffs have not met their high burden to show that this Court should issue a temporary restraining order, they have put forth concerning factual allegations of financial wrongdoing, with some evidence to support them.  This Court is, therefore, sensitive to Plaintiffs' concerns that Matthew may dissipate assets during the pendency of this litigation.  Accordingly, this Court will impose the following schedule of limited expedited discovery and optional briefing and will conduct an evidentiary hearing on April 7, 2022 to decide whether a preliminary injunction is appropriate:

Issuance of Discovery Requests: March 10, 2022

12

Discovery Responses:  March 28, 2022

Optional Submission of Supplemental Briefing by Any Party: April 4, 2022

Evidentiary Hearing: April 7, 2022 at 10 am

This limited expedited discovery should be limited to the existing financial status of all Defendants—both individual and corporate, any inappropriate transactions or financial activity since November, 2021 that are not adequately explained by Defendants' promised document productions, and the parties' respective ownership interests in GCC and the GC Entities. Critically, the limited expedited discovery must not focus on the alleged harm that is described in the Plaintiffs' filings to date.  Instead, the discovery must be targeted to evaluate two specific risks: first, the risk that absent a preliminary injunction *additional* harm will occur during the pendency of this litigation, and second, the risk that, absent a preliminary injunction, Defendants will not be able to satisfy a monetary judgment if Plaintiffs prevail.  To the extent that Plaintiffs believe the expedited discovery reveals that they cannot meet the standard for a preliminary injunction, they should promptly advise the Court.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order, ECF 2, will be denied.  The parties are ordered to engage in limited expedited discovery, as set forth above, and an evidentiary hearing will be set for April 7, 2022 so that this Court can decide whether a preliminary injunction is necessary.  A separate order follows.

Dated: March 3, 2022                                    _____/s/_____

                                                        Stephanie A. Gallagher
                                                        United States District Judge